# 22-1726

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

MARINA SOLIMAN, on behalf of herself and all others similarly situated,
Plaintiff-Appellant,

v.

SUBWAY FRANCHISE ADVERTISING FUND TRUST, LTD.,
Defendant-Appellee,

Does, 1 through 20, inclusive, and each of them.
Defendant,

On Appeal from the United States District Court for the
District of Connecticut in Case No. 3:19-cv-00592-JAM
Judge Jeffrey A. Meyer

## APPELLANT MARINA SOLIMAN'S PETITION FOR REHEARING EN BANC

LAW OFFICES OF TODD M. FRIEDMAN,
P.C.
Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
21031 Ventura Blvd, Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com

WOCL & LEYDON, L.L.C.
Brenden P. Leydon, Esq. (CT16026)
80 Fourth Street
Stamford, CT 06905
Telephone: (203) 324-6164
Facsimile: (203) 324-1407
BLeydon@tooherwocol.com
FEDERAL BAR NO.: CT16026
*ATTORNEYS FOR APPELLANT*

# TABLE OF CONTENTS

**RULE 35 STATEMENT AND INTRODUCTION** ...............................................1

**STANDARD OF REVIEW** ...........................................................................5

**STATEMENT OF THE CASE**……….…………………………………………..5

**REASONS FOR EN BANC REVIEW**……………………………………………..8

   I. **The Definition of ATDS is an Important Developing Question of Law**…8

   II. *En Banc* **Rehearing Should Be Granted to Correct Inconsistencies Between the Panel Majority's Opinion,** *Facebook* **and the Plain Text of the TCPA** …………………………………………….………………………...10

   III. **Judge Nardacci's Well-Reasoned Dissent Demonstrates a Split Among Courts Interpreting ATDS That Should Be Addressed** *En Banc*…..…………15

**CONCLUSION**...........................................................................................17

**CERTIFICATE OF COMPLIANCE** .............................................................19

**CERTIFICATE OF SERVICE** .....................................................................20

# TABLE OF AUTHORITIES

**Cases**

*ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018) .................................................................................................10

*Atkinson v. Pro Custom Solar LCC*, No. SA-21-cv-178-OLG, 2021 WL 2669558 (W.D. Tex. June 16, 2021) ......................................................................18

*Bank v. Digital Media Solutions, Inc.*, No. 22-cv-293- 2023WL 1766210 (E.D.N.Y. Feb. 3, 2023) ..............................................................................18

*Barr v. American Association of Political Consultants, Inc.*, 140 S.Ct. 2335 (2020) ...................................................................................................................8

*Daschbach v. Rocket Mortg., LLC*, No. 22-cv-346-JL, 2023 WL 2599955 (D.N.H. Mar. 22, 2023)......................................................................................19

*Facebook, Inc. v. Duguid*, 141 S.Ct. 1163 (2021) .......................................... passim

*Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) .......... 4, 9, 11, 14

*Montanez v. Future Vision Brain Bank, LLC*, 536 F.Supp.3d 828 (D. Colo. 2021) ...................................................................................................................18

*Soliman v. Subway Franchisee Advertising Fund Trust, Ltd.*, No. 22-1726-cv, 2024 WL 2097361 (2d Cir. May 10, 2024) ......................................................... passim

**Statutes**

47 U.S.C. § 227(a)(1)(A) .......................................................................................12

**Other Authorities**

18 FCC Rcd. 14014 (2003) .......................................................................................8

23 F.C.C. Rcd. 559 (Jan. 4, 2008)............................................................................8

30 F.C.C. Rcd. 7961 (2015) ......................................................................................8

7 FCC Rcd. 8752 (F.C.C. September 17, 1992) ......................................................8

*Telemarketing Practices: Hearing Before the Subcomm. On Telecomm.s & Fin. Of the H. Comm. On Energy & Commerce on H.R. 628, H.R. 2131, & H.R. 2184, 101st Cong. 111 (1991)* ......................................................................15

**Rules**

F.R.A.P. 40(a)(1) ....................................................................................5

F.R.A.P. 35(a) .........................................................................................5

F.R.A.P. 35(b) .........................................................................................5

F.R.A.P. 35(c) .........................................................................................5

# RULE 35 STATEMENT AND INTRODUCTION

The panel majority erroneously affirmed the District Court's order dismissing Marina Soliman's class action complaint alleging that Subway violated the Telephone Consumer Protection Act ("TCPA"). In so doing, the panel majority adopted a deeply flawed interpretation of the definition of an Automatic Telephone Dialing System ("ATDS"), the implications of which are far-reaching.

Simply put, there is no such thing as a random or sequential *telephone* number generator. Random and sequential number generators, however, do exist, predate the TCPA, and have been used by software engineers for generations to automate technology—including in the automation of telephone calls. The panel majority arrived at its erroneous conclusion by using syntax and grammar to dissect conjoined terms which when read together describe a well-defined piece of technology. As an illustration, if Congress regulated "cellular telephones" courts would never seriously consider splitting that term into two separate words, consulting dictionaries and canons of construction and asking whether the word "cellular" meant "relating to or consisting of living cells." Everybody knows what a cell phone is. And while not everybody knows what a random number generator or a sequential number generator are, it is nonetheless a matter of record that when enacting the TCPA, *Congress* was aware of what a number generator is and chose to include that piece of technology in its definition of ATDS. Unfortunately,

hampered by a limited understanding of this technology, courts have grappled with convoluted canons of construction rather than a plain technical meaning thereby leading to a nonsensical interpretation of an important consumer privacy statute, effectively excising the ATDS restriction out of the TCPA. Again, there is no such thing as a random or sequential *telephone* number generator.

The panel majority held that to qualify as an ATDS, equipment must use a random or sequential number generator to create the telephone number to be called. But, as Judge Nardacci pointed out in her dissent,[1] this conclusion is directly contrary to the plain text of the TCPA and Supreme Court precedent. The majority improperly added the word "telephone" into a known technical tool "random or sequential number generator," that appears in the statute. Rather than give this technical phrase its straightforward technical meaning, the majority instead concluded that a random or sequential number generator must mean equipment that creates telephone numbers itself—equipment that does not exist and was not the target of Congress's enactment of the TCPA. Justice Sotomayor— writing for a unanimous Supreme Court—explicitly stated that Soliman's technical

---

[1] Judge Nardacci is not an outlier. Judge VanDyke, in *Brickman v. U.S.*, raised similar qualms with the Ninth Circuit's interpretation of ATDS. 56 F.4th 688, 691–693 (9th Cir. 2022). These dissenting judges are correct in their critique. Their opinions demonstrate an emerging split that will have to be decided by the Supreme Court. The Second Circuit's full panel should weigh in before that happens.

reading of a random or sequential number generator would qualify as an ATDS, yet such technology would not be considered an ATDS under this Court's holding. That is reason enough to grant *en banc* review. Soliman petitions for rehearing so this Court can correct this flawed interpretation consistent with Supreme Court precedent, and weigh in on an important and developing question of law.

The panel majority completely abandoned the disjunctive test written into the statute and articulated by the Supreme Court. Although the statute—and the Supreme Court—states that an ATDS is technology that can, using a random or sequential number generator, either store or produce telephone numbers to be called, the majority opinion of the panel requires that an ATDS create telephone numbers. "Store or produce" does not mean "create." That is plain as day. There is no basis in the law for the majority to have rewritten the statute in such a manner, especially when a random number generator and a sequential number generator are known tools used by software engineers building automated telephone dialing equipment, and a random or sequential telephone number generator has never existed.

While various courts across the country have followed the flawed logic of the majority panel, dozens more have agreed with Judge Nardacci's reasoning. Yet no circuit-level court has heard this issue *en banc*. While it seems likely the Supreme Court will resolve this issue eventually, there is no guarantee that it will

do so in this case. For this Court to maintain consistency with existing Supreme Court precedent it must review Soliman's appeal *en banc* before that happens, and critically evaluate the panel majority's flawed opinion.

Soliman's appeal presents an ideal fact pattern for this Court to clarify these issues. Soliman incorporated actual dialer code in her briefing containing a sequential number generator, explained how the technology works and how such code is programmed to both store and produce telephone numbers to be called automatically by the SMS blasting platform *en masse* with no human involvement. This case lends strong factual support to Judge Nardacci's dissent which emphasizes that a number generator is a well understood tool used in software engineering and should be proscribed its technological definition. Soliman's appeal also gives factual specificity to what the Supreme Court referred to in *Facebook, Inc. v. Duguid's* footnote 7. 141 S.Ct. 1163, 1172 n.7 (2021).

The Supreme Court in *Facebook* was concerned that *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) failed to require a random or sequential number generator in its definition of ATDS. Soliman identified the number generator, just as the Supreme Court required. Yet, the panel majority affirmed the dismissal of her complaint, going directly against the Supreme Court's instructions in *Facebook*. *En banc* rehearing should be granted so this Court can secure uniformity in its decisions and correct the plain error of the panel majority.

## STANDARD OF REVIEW

F.R.A.P. 35 permits *en banc* determination when "(1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." F.R.A.P. 35(a). A petition should address whether a decision conflicts with Supreme Court or Circuit-level authority, whether consideration by the full court is necessary to secure uniformity of the court's decisions, and whether the proceeding involves questions of exceptional importance. F.R.A.P. 35(b). Rehearing *en banc* must be requested within 14 days after the entry of judgment. F.R.A.P. 35(c); F.R.AP. 40(a)(1).

## STATEMENT OF THE CASE

On April 22, 2019, Marina Soliman filed a class action Complaint alleging that Subway violated the TCPA by sending to her cellular telephone, and those of others similarly situated, telemarketing text messages using an ATDS. Soliman alleged that these solicitation text messages were blasted out *en masse* using an SMS blaster, which is a traditional campaign-based dialing platform that automatically sends thousands of text messages to thousands of people with the click of a button and was used in this fashion to automatically dial Soliman.

Soliman further alleged that the SMS blaster was programmed with source code that relied upon sequential number generators to both store and produce the

telephone numbers that the system called. Soliman's briefing contained a specific

example of such a sequential number generator coded into the operation of an SMS

blaster alleged to function identically to the one used by Subway:

```
730 if (!this.recordList.isEmpty()) {
731 this.recordNumber++;
732 final String comment = sb == null ? null :
sb.toString();
733 result = new CSVRecord(this,
this.recordList.toArray(Constants.EMPTY_STRING_AR
RAY),
comment,
734 this.recordNumber, startCharPosition);
735 }
736 return result;
737 }
```

APX-27.

Soliman explained exactly how this code functions and utilizes number

generators:

> These lines of code, and specifically the "++" in line 731,
> generate sequential numbers as part of a loop, used to
> store and produce telephone numbers, which are
> thereafter mass-blasted text messages to thousands of
> consumers in mere seconds, without any human
> intervention whatsoever.

*Id.*

Subway's telemarketing text messages were sent to consumers without prior

express consent, as Soliman (and putative class members) had revoked consent to

be contacted by Subway, which Subway ignored. Thus, Subway was mass-dialing

thousands of consumers without consent, just as Congress intended to prohibit with the TCPA.

The District Court erred by dismissing Soliman's ATDS allegations. According to the District Court, Soliman's claims failed "because when the Act refers to a 'random or sequential number generator,' it means a generator of random or sequential telephone numbers." But this is inconsistent with the Supreme Court's test, set forth in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ("*Facebook*"). *Facebook* does not exclude the dialing software used to dial Soliman, which utilizes number generators in the code to both store and produce the telephone numbers to be called. Thus, the District Court's ruling contravenes the instructions of the Supreme Court.

Soliman appealed, and a divided panel affirmed, agreeing with the District Court's reasoning. Judge Nardacci dissented, arguing that the panel majority's opinion was not supported by the plain text of the statute, the Supreme Court's precedent in *Facebook*, or the underlying purposes of the TCPA. Judge Nardacci is right—the majority opinion of the panel is flawed. It misapplied the Supreme Court's instructions in *Facebook*. Its holding is inconsistent with the plain text of the TCPA. Soliman alleged the dialing software used a sequential number generator to both store and produce telephone numbers to be called. Nothing more is required under the text of the TCPA and under *Facebook*.

## REASONS FOR *EN BANC* REVIEW

## I. THE DEFINITION OF ATDS IS AN IMPORTANT DEVELOPING QUESTION OF LAW.

"Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone." *Barr v. American Association of Political Consultants, Inc.*, 140 S.Ct. 2335 (2020). The TCPA is such an important and oft-litigated statute that the Supreme Court, for the first time ever in *Barr*, severed an unconstitutional provision of a statute that otherwise would have been struck down on First Amendment grounds. The Supreme Court issued an opinion the following year on the definition of ATDS. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021). Since *Facebook*, there have been multiple Circuit-level opinions further defining ATDS. And the Supreme Court will likely be asked to weigh in yet again. This is inevitable, because Americans continue to be bombarded by robodialers, and litigation will continue until the issues in this case are resolved.

How ATDS is defined is a question that has seen a great deal of litigation in the thirty years of the statute. There are four FCC Orders defining the statute.[2] The Ninth Circuit has issued four decisions on the question in the past several

---

[2] See 7 FCC Rcd. 8752 (F.C.C. September 17, 1992); 18 FCC Rcd. 14014 (2003); 23 F.C.C. Rcd. 559 (Jan. 4, 2008); 30 F.C.C. Rcd. 7961 (2015).

years.[3]   Other circuits have also weighed in.[4]   And the D.C. Circuit similarly addressed the issue and the FCC's Rules.[5]   While *Facebook* brought some clarity to the statute, it left open the questions raised by Soliman in her appeal.

As the D.C. Circuit stated, referring to whether an ATDS must self-generate phone numbers, "[t]he choice between the interpretations is not without practical significance." *ACA International v. Federal Communications Commission*, 885 F.3d 687, 703 (D.C. Cir. 2018).   That practical significance is straightforward— there is no such thing as an ATDS if the majority opinion of the panel is allowed to stand.   But if Soliman and Judge Nardacci's view is correct, only phone calls and text messages which are blasted out thousands at a time by unmanned computers would qualify as an ATDS.   And even amongst these exceptionally intrusive calls, only those made without consent are unlawful.   Virtually every American has received such telephone calls.   Most receive them daily.   With so much litigation, involving fortune 500 companies, the FCC, and affecting every American's privacy rights, this is clearly a question of great legal significance.

---

[3]See *Facebook, Inc. v. Duguid*, 592 S.Ct. 1163 (2021); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018); *Borden v. eFinancial, LLC*, 53 F.4th 1230 (9th Cir. 2022); and *Brickman v. U.S.*, 56 F.4th 688 (9th Cir. 2022).

[4] *Panzarella v. Navient Solutions, Inc*., 37 F.4th 867 (3rd Cir. 2022); *Beal v. Outfield Brew House, LLC*, 29 F.4th 391 (8th Cir. 2022).

[5] *ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018).

The implications of the panel's majority opinion are wide sweeping. It would effectively write the ATDS provisions out of the TCPA. This is because neither autodialers today, nor in 1991, use number generators to create the telephone numbers they dial. Autodialers have not self-generated *telephone* numbers since the 1960s—decades before the TCPA was enacted. The deluge of robocalls received by consumers will only increase under the panel majority's formulation of an ATDS. And Americans will be left with no legal recourse for the violation of their privacy rights because no autodialer in use today would qualify as an ATDS under the opinion of the panel majority. Such a result cannot possibly be what Congress intended. Because this case presents an important issue of law, e*n banc* review should be granted.

## II. *EN BANC* REHEARING SHOULD BE GRANTED TO CORRECT INCONSISTENCIES BETWEEN THE PANEL MAJORITY'S OPINION, *FACEBOOK* AND THE PLAIN TEXT OF THE TCPA

In *Facebook*, the Supreme Court refined the definition of ATDS, reigning in courts that had applied the TCPA too broadly. *Facebook* did three things. First, *Facebook* struck down *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018), which required only that an ATDS have the capacity to store and automatically dial telephone numbers, eliminating the requirement of random or sequential number generators. *See Facebook*, 141 S. Ct. at 1170. Second,

*Facebook* made it clear that an ATDS must have the capacity to either store or produce telephone numbers to be called, using a random or sequential number generator. *Id.* at 1173. And third, *Facebook* explained how a system might store telephone numbers using a number generator. *Id.* at 1172 n.7:

> [A]s early as 1988, the U.S. Patent and Trademark Office issued patents for devices that used a random number generator to store numbers to be called later . . . For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time.

*Id.* (emphasis added). This is exactly what Soliman alleged and briefed, both before the District Court and the panel—that Subway's autodialer used a sequential number generator to store telephone numbers, and used a random or sequential number generator to produce telephone numbers from that stored list and determine the order in which they would be dialed. APX-27; 128–131

The panel majority ignored *Facebook*, holding that "'number' in the TCPA refers to 'telephone number,' and not to coding or indexing numbers created by a random number generator." *Soliman v. Subway Franchisee Advertising Fund Trust, Ltd.*, No. 22-1726-cv, 2024 WL 2097361, at *5 (2d Cir. May 10, 2024). But this holding—that an ATDS must create telephone numbers—is plainly contrary to *Facebook*. The majority panel misconstrued Soliman's allegations and how number generators operate. What is telling is that a system which operates exactly

as described by Justice Sotomayor in footnote seven would not be an ATDS according to the panel majority. That is unfathomable, given that *Facebook* was a unanimous opinion of the Court.

The panel majority's opinion mangles the text of the statute. The majority identifies three instances where the word "number" is used in the definition of ATDS. *Id.* at *4. The first is a reference to "*telephone* numbers to be called." *Id.*; 47 U.S.C. § 227(a)(1)(A) (emphasis added). And the third reference states that an ATDS can dial such numbers. *Id.* Reasoning that these two references to "numbers" mean telephone numbers, the panel majority concluded that the second reference to the word "number"— "using a random or sequential number generator,"—must also refer to telephone numbers. *Id.*

This reasoning is deeply flawed. First, in 47 U.S.C. § 227(a)(1)(A), Congress used the word "telephone" when referencing telephone numbers to be called but did not use the word "telephone" when describing a number generator in the second part of that sentence. If Congress intended for the phrase "random or sequential number generator" to refer to telephone numbers, surely it would have included the word "telephone" before the word "number," as it did a few words earlier in the statute. But it did not. Why then, did the majority panel add language to the statute?

Second, the panel majority's opinion eliminates the disjunctive test articulated in the statute—the statute says "to store or produce" not "to create."[6] But according to the panel majority, using a random or sequential number generator to store telephone numbers does not satisfy the test for ATDS. *Id.* at *7–8. For the majority order of the panel to be consistent with the statute, ATDS would need to be defined as "equipment that has the capacity—(A) to create telephone numbers to be called, using a random or sequential telephone number generator; and (B) to dial such numbers." This is not what the statute or the Supreme Court's interpretation of it say. It excises half of the disjunctive test from the statute and adds other words to the statute. Ironically, this is the same interpretive error that the Ninth Circuit committed in *Marks* (excising "random or sequential number generator" from the statute and adding "automatically" to the statute) which led to the *Facebook* decision.

Third, the panel majority's interpretation is a result of a complete misunderstanding of the technology at issue. Put simply, a "random or sequential number generator" refers two to two specific pieces of software code. Judge

---

[6] Relying on *Facebook*, the panel majority argues that the word "produce" means "creating the telephone number in the first place." *Soliman*, 2024 WL 2097361 at *7. There is no support for this position in *Facebook. See Facebook,* 141 S.Ct. at 1172. Even if this were the correct interpretation of the word "produce," the panel majority is still wrong because an ATDS can also "store" telephone numbers using a number generator.

Nardacci recognized this in dissent. *Soliman,* 2024 WL 2097361 at *10. But instead of giving this technical phrase its technical meaning, the panel majority took a misguided grammatical approach and dissected the phrase into individual words. This is no different than a court interpreting "manual transmission" in a statute concerning automobiles by looking at the words "manual" and "transmission" separately, consulting dictionaries, and concluding that the statute concerned sending mail via carrier pigeon. Likewise, a court would never seriously consider parsing the term "cellular telephone" into two separate words and thereafter question whether the correct statutory definition of cellular might be "relating to or consisting of living cells."

These would not be considered by courts because judges as lay persons are familiar with manual transmissions and cellular telephones.[7] But when faced with a less familiar technology—the random or sequential number generator, which was explicitly adopted by Congress in its technological parlance as shown by the Congressional record[8]—this common sense was thrown out the window.

---

[7] Again, ironically, Soliman's position regarding the definition of artificial voice was disregarded by the majority panel for this commonsense reasoning as its justification. Why then did the panel inconsistently not apply such logic and common sense when interpreting the ATDS provision of the statute?

[8] *See Telemarketing Practices: Hearing Before the Subcomm. On Telecomm.s & Fin. Of the H. Comm. On Energy & Commerce on H.R. 628, H.R. 2131, & H.R.*

Soliman has provided examples of a sequential number generator Subway used to store and produce telephone numbers to be called by the SMS blaster. She can point to the number generator and explain what it does, just as the Supreme Court instructed in *Facebook*. However, if the panel majority's opinion is allowed to stand, lower courts must disregard these facts and consider a completely different test—whether the system self-generates telephone numbers. Until a full panel corrects this error, the Second Circuit will be on the wrong side of Supreme Court precedent. *En banc* review is necessary to correct this error.

### III. JUDGE NARDACCI'S WELL-REASONED DISSENT DEMONSTRATES A SPLIT AMONG COURTS INTERPRETING ATDS THAT SHOULD BE ADDRESSED *EN BANC*

Notable in this discourse is the split emerging across a plethora of courts. Judge Nardacci's dissent underscores this disagreement among judges, and she is not alone. For example, the Ninth Circuit recently issued two conflicting ATDS orders: *Borden* and *Brickman*. *Borden* was issued first and supports Subway's position. *See generally Borden*, 53 F.4th 1230. However, a few weeks later the *Brickman* court followed *Borden* on "law of the circuit" principles, while including a strong concurrence from Judge VanDyke, refuting *Borden's* reasoning.

---

*2184,* 101st Cong. 111 (1991) (statement of Tracy Mullen, Senior Vice President, Government Affairs, National Retail Merchants Association).

*Brickman*, 56 F.4th at 691–693.   Judge VanDyke's opinion supports Soliman's position and suggests disagreement within the Ninth Circuit about the validity of *Borden. Id.*

Agreeing with Judge VanDyke's concurrence in *Brickman*, Judge Nardacci's dissent identifies five reasons why the majority committed error.   First, Judge Nardacci points out that the majority "reads the word 'telephone' into the phrase 'random or sequential number generator,'" even though a "random or sequential number generator" is logically distinct from a telephone number. *Soliman*, 2024 WL 2097361 at *10.   Second, Judge Nardacci reasoned—correctly—that the panel majority's interpretation renders the word "store" in the ATDS definition superfluous. *Id.*   Third, Judge Nardacci stated that the majority's interpretation renders the defense of prior express consent superfluous because nobody could ever consent to being called by equipment that randomly creates their telephone number *Id.* at *11.   Fourth, Judge Nardacci agreed that the panel majority's opinion was inconsistent with *Facebook. Id.*   And finally, Judge Nardacci argued in dissent that the majority did not give the phrase "random or sequential number generator" its technical meaning. *Id.*

Dozens of judges—including some within this circuit—have penned similar orders. *See, e.g., Bank v. Digital Media Solutions, Inc.*, No. 22-cv-293- 2023 WL 1766210 (E.D.N.Y. Feb. 3, 2023) (rejecting the concept of a random telephone

number generator, and declining to adopt a standard for ATDS that requires telephone number generation); *Montanez v. Future Vision Brain Bank, LLC*, 536 F.Supp.3d 828, 837–838 (D. Colo. 2021); *Atkinson v. Pro Custom Solar LCC*, No. SA-21-cv-178-OLG, 2021 WL 2669558, at *1 (W.D. Tex. June 16, 2021); *Daschbach v. Rocket Mortg., LLC*, No. 22-cv-346-JL, 2023 WL 2599955, at *11 (D.N.H. Mar. 22, 2023). Despite this disagreement, however, no circuit-level court has heard this issue *en banc*.

Judge Nardacci's well-reasoned dissent recites a correct reading of the law and, more importantly, a compelling criticism of the panel majority's opinion. While the Supreme Court may need to step in to clarify this issue nationally, this Court can—and should—review Soliman's case *en banc* and correct the faulty interpretation adopted by the panel majority to assure uniformity within the Second Circuit.

## CONCLUSION

The majority opinion of the panel is deeply flawed and directly contrary to Supreme Court precedent. This is the exact situation for which *en banc* review exists. Soliman's case carries a fact pattern which would meaningfully inform the interpretation of ATDS. While *en banc* review is rarely granted, it should be granted here.

Dated: May 24, 2024                    Respectfully Submitted,


                                  BY: /s/ Adrian R. Bacon
                                      ADRIAN R. BACON
                                      TODD M. FRIEDMAN


                                      ATTORNEYS FOR
                                      APPELLANT

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED. R. APP. 35(b)(2) and (3)

I certify pursuant to Fed. R. App. P. 35(b)(2) that the attached Petition for Rehearing En Banc for the Appellant Marina Soliman complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) as it is proportionately spaced, has a typeface of 14 points, and contains 3,893 words.

Dated: May 24, 2024                                   Respectfully Submitted,


                                        BY: /s/ Adrian R. Bacon
                                            ADRIAN R. BACON
                                            TODD M. FRIEDMAN

                                            ATTORNEYS FOR
                                            APPELLANT

# CERTIFICATE OF SERVICE

I, Adrian R. Bacon, certify that on May 29th, 2024, the Appellant's Petition for Rehearing En Banc was e-filed through the CM/ECF System, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities. The Court's CM/ECF system sends an email notification of the filing to the parties and counsel of record listed above who are registered with the Court's EMC/ECF system. A copy of the e-filed documents were sent, via the EMC/ECF system:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
JAY T. RAMSEY,
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055

KLEIN MOYNIHAN TURCO LLP
Neil E. Asnen (*pro hac vice*)
450 Seventh Avenue, 40th Floor
New York, New York 10123

**LAW OFFICES OF TODD M. FRIEDMAN**

BY: _/s/ Adrian R. Bacon
     Adrian R. Bacon, Esq.

**Opinion Filed 05/10/2024**

**Docket #122-1,**

**Docket #123**

22-1726-cv
*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2023

(Submitted:  October 24, 2023      Decided: May 10, 2024)

Docket No. 22-1726-cv

———————————

MARINA SOLIMAN, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellant,*

v.

SUBWAY FRANCHISEE ADVERTISING FUND TRUST, LTD.,

*Defendant-Appellee,*

AND DOES, 1 THROUGH 20, INCLUSIVE, AND EACH OF THEM,

*Defendants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

Before:   CHIN AND PARK, *Circuit Judges,* and NARDACCI, *District Judge.*[*]

———————————

[*] Judge Anne M. Nardacci, of the United States District Court for the Northern District of New York, sitting by designation.

Appeal from a judgment of the United States District Court for the District of Connecticut (Meyer, *J.*), granting defendant-appellee's motion to dismiss for failure to state a claim. Plaintiff-appellant received a marketing text message to her cell phone sent by an automated system using a pre-existing list of telephone numbers. She alleged that the text message violated the Telephone Consumer Protection Act, 47 U.S.C. § 227. The district court concluded that the statute did not apply and dismissed the first amended complaint.

AFFIRMED.

Judge Nardacci concurs in part and dissents in part in a separate opinion.

—————————————————

Todd M. Friedman, Adrian R. Bacon, Law Offices of Todd M. Friedman, P.C., Woodland Hills, CA,

             - and -

Brenden P. Leydon, Wocl & Leydon, L.L.C., Stamford, CT, *for Plaintiff-Appellant Marina Soliman*.

Ian C. Ballon, Lori Chang, Greenberg Traurig, LLP, Los Angeles, CA, and Brian T. Feeney, Greenberg Traurig, LLP, Philadelphia, PA, *for Defendant-Appellee Subway Franchisee Advertising Fund Trust, Ltd.*

—————————————————

- 2 -

CHIN, *Circuit Judge*:

Plaintiff-appellant Marina Soliman sued defendant-appellee Subway Franchisee Advertising Fund Trust, Ltd. ("Subway") for damages based on a text message she received on her cell phone offering her a free bag of potato chips. She contended that the text message, which was generated by an automatic dialing system using a pre-existing list of telephone numbers, violated the Telephone Consumer Protection Act of 1991 (the "TCPA"), 47 U.S.C. § 227. Because we conclude that the text message did not violate the TCPA, we affirm the order of the district court (Meyer, *J.*) granting Subway's motion to dismiss and its judgment dismissing the first amended complaint.

## STATEMENT OF THE CASE

### I.   *Facts*

As alleged in the first amended complaint (the "Complaint"), the facts are as follows:

Prior to December 1, 2016, Subway sent one or more automated marketing text messages to Soliman's cell phone.  On December 1, 2016, Subway sent another automated marketing text message to Soliman's cell phone, which read:

> FREE CHIPS RULE!  Right now @SUBWAY, get ANY bag of chips
> FREE with a sub purchase.  Exp 12/6: http://mfon.us/rk6srrfdjue
> HELP/STOP call 8447887525

Joint App'x at 127.

Soliman responded to the message by texting "STOP."  Subway immediately responded with a computer-generated response advising Soliman that she had been "unsubscribed from all programs" and that she would "no longer receive any text alerts."  *Id*.  Nonetheless, on December 5, 2016, Subway sent another automated text message to Soliman's cell phone, stating:

> Your weekly SUBWAY offer is waiting, Don't miss out!  Expires
> 12/6:  http://mfon.us/rk6srrfdjue  HELP/STOP call 8447887525

*Id*.

Subway sent the text messages to Soliman's cell phone using "short message script" ("SMS") technology.  Subway used an automated text-messaging system that was able to "dial telephone numbers stored as a list or in a database without human intervention."  *Id*. at 128.  Subway had contracted with Mobivity to provide SMS text-messaging services, and Mobivity employed a "blast platform" that used:

> an algorithm whereby a random or sequential number generator,
> similar to a randomization formula or sequential dialing formula,
> selects which number to dial from the stored list of numbers, and

- 4 -

sequences those numbers in order to automatically dial the numbers and send ou[t] text messages *en masse*.

*Id*. at 128, 130-31.

We note additional facts that are not alleged in the Complaint but that are undisputed:

Subway's system did not generate telephone numbers, as Subway's system used a "stored" or pre-existing list of telephone numbers. Nor was Soliman's cell phone number *generated* by Subway's system. Rather, as we noted in a prior decision in this matter, Soliman submitted her cell phone number to Subway earlier in the year by taking advantage of an offer to have Subway "deals" sent "directly" to her phone. *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 831-32 & n.1 (2d Cir. 2021).[1] She did so by texting "Subway" to the code provided in a Subway advertisement, thereby providing Subway with her cell phone number. She received an immediate response from Subway and then texted her zip code back, thereby confirming her consent to receiving Subway offers through her cell phone. *Id*. at 832.

## II.    *Prior Proceedings*

---

[1]    The earlier appeal involved the enforceability of an arbitration provision on Subway's website. We held that Soliman was not bound by the arbitration clause because the terms were not reasonably "clear and conspicuous." 999 F.3d at 830.

On April 22, 2019, Soliman filed this putative class action below. She filed the Complaint on July 29, 2021, alleging that Subway's December 5, 2016 text sent to her cell phone violated the TCPA in two ways: (1) by using an automatic telephone dialing system and (2) by using an "artificial or prerecorded voice." *See* 47 U.S.C. § 227(b)(1)(A)(iii). Subway moved to dismiss the Complaint pursuant to Fed. R. Civ. P. Rule 12(b)(6) on August 30, 2021.

On July 18, 2022, the district court issued an order granting Subway's motion to dismiss, concluding that both claims failed. *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, No. 19-cv-592 (JAM), 2022 WL 2802347 (D. Conn July 18, 2022). First, the district court held that the TCPA only bars the use of a dialing system that randomly or sequentially generates *telephone* numbers, and not a system that relies on a stored list of pre-existing telephone numbers and only generates indexing or other coding numbers.[2] Second, the district court held that the TCPA's prohibition on the use of an "artificial or prerecorded voice" did not apply to text messages. *Id*. at *2-3. Judgment dismissing the Complaint was entered accordingly on July 18, 2022.

---

[2]     Soliman argues that certain numbers used in an SMS blaster's programming code are "generated" in a fashion that renders that device an ATDS. We will refer to these sorts of numbers as "coding numbers. "

This appeal followed.

## DISCUSSION

We review a decision to grant a motion to dismiss under Fed. R. Civ.

P. 12(b)(6) *de novo*. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir.

2016).

## I.     *The TCPA*

The TCPA provides in pertinent part:

It shall be unlawful for any person . . . to make any call (other than a
call made for emergency purposes or made with the prior express
consent of the called party) using any *automatic telephone dialing
system* or an *artificial* or prerecorded *voice* . . . to any telephone
number assigned to a . . . cellular telephone service.

47 U.S.C. § 227 (b)(1)(A)(iii) (emphases added).  An "automatic telephone dialing

system" -- or "ATSD" -- is defined as:

equipment which has the capacity--

(A) to store or produce telephone numbers to be called, using a
random or sequential number generator; and

(B) to dial such numbers.

47 U.S.C. § 227(a)(1).

In creating the TCPA, Congress sought to address the "proliferation

of intrusive, nuisance calls" made by telemarketers.  *ACA Int'l v. FCC*, 885 F.3d

- 7 -

687, 692 (D.C. Cir. 2018) (citing Tel. Consumer Prot. Act of 1991, Pub. L. No. 102-243, § 2(6)-(7), 105 Stat. 2394). Of particular concern were automated calls to emergency services, "such as hospitals and fire and police stations," calls that "w[ould] not disconnect the line for a long time after the called party h[u]ng[] up the phone, thereby preventing the called party from placing his or her own calls," and calls placed by "automatic dialers [that would] dial numbers in sequence, thereby tying up all the lines of a business [with multiple, sequential lines] and preventing any outgoing calls." S. Rep. No. 102-178, at 2 (1991). The TCPA thus prohibits the use of an ATSD to call certain "emergency telephone line[s]" and lines for which the "party is charged for the call," 47 U.S.C. § 227(b)(1)(A)(i), (iii), and it also bars using an ATSD "in such a way that two or more telephone lines of a multi-line business are engaged simultaneously," *id*. § 227(b)(1)(D). *See generally Facebook, Inc. v. Duguid,* 592 U.S. 395, 399-400 (2021) (discussing purpose of TCPA).

Here, the district court held that Subway's actions did not violate the TCPA because the system used by Subway to send the text message (1) is not an ATSD as defined by the TCPA and (2) does not use an artificial or prerecorded voice.

- 8 -

**II.**    *Automated Dialing Systems*

The first issue turns on the definition of an ATSD.  Soliman argues that the definition includes a system that autodials numbers randomly drawn from a *pre-existing* list of telephone numbers.  In other words, she argues that the definition encompasses a dialing system that does *not* generate the telephone numbers itself, but instead uses telephone numbers drawn from, for example, a list of telephone numbers submitted by consumers signing up for a program or benefit.  She contends that the phrase in the statutory definition -- "using a random or sequential number generator" -- refers not to generating a *telephone* number but to generating *any* number used to store or produce telephone numbers in the SMS blaster's programming code.

In contrast, Subway argues that the definition encompasses only systems that generate *telephone* numbers, and that systems utilizing pre-existing lists of telephone numbers are not covered.  The district court concluded, based both on rules of statutory interpretation and the Supreme Court's decision in *Duguid,* 592 U.S. at 395, that the system employed by Subway was not an automatic telephone dialing system covered by the TPCA because it did not generate telephone numbers.

The courts that have addressed the issue have reached conflicting results. Three circuits -- the only circuit courts to consider the issue -- have held that the TCPA covers only ATSDs that generate *telephone* numbers, that is, systems that do not rely on pre-existing lists of telephone numbers. *See Borden v. eFinancial, LLC*, 53 F.4th 1230, 1231 (9th Cir. 2022) (holding that ATSDs "must generate and dial random or sequential *telephone* numbers under the TCPA's plain text" in a case involving an autodialer that selected telephone numbers from a pre-existing list of numbers); *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 881-82 (3d Cir. 2022) (holding section 227(b)(1)(A)(iii) not violated where autodialing system called telephone numbers from "specific, curated borrower lists," that were not "randomly or sequentially produce[d] or store[d]"); *Beal v. Outfield Brew House, LLC*, 29 F.4th 391, 393 (8th Cir. 2022) (holding that "an automated marketing system that sends promotional text messages to phone numbers randomly selected from a database of customers' information" is not an ATSD within meaning of TCPA).

Other courts -- district courts only and one concurring judge on the Ninth Circuit -- have reached a different conclusion. *See, e.g., Scherrer v. FPT Operating Co.*, No. 19-cv-03703-SKC, 2023 WL 4660089, at *3 (D. Colo. July 20,

2023) ("this Court finds an autodialer that stores a list of telephone numbers using a random or sequential number generator to determine the dialing order is an ATSD under the TCPA"); *Libby v. Nat'l Republican Senatorial Comm.*, 551 F. Supp. 724, 729 (W.D. Tex. 2021) (holding that complaint stated a claim under TCPA where system used a random or sequential number generator to select telephone numbers from a stored list); *see also Brickman v. United States*, 56 F.4th 688, 691 (9th Cir. 2022) (VanDyke. *J.*, concurring) (concurring based on circuit precedent but concluding that "it does not follow that a 'random or sequential number generator' in the TCPA's autodialer definition must be limited to a tool that produces only *telephone* numbers").

We conclude, based on principles of statutory interpretation and the Supreme Court's decision in *Facebook, Inc. v. Duguid*, that the TCPA does not apply here.

A.    *Statutory Interpretation*

When interpreting a statutory provision, we begin with the words of the statute.  *See, e.g.*, *Zepeda-Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) (citing *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013)); *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) ("Every exercise in statutory construction

- 11 -

must begin with the words of the text.").  If the words of a statute are clear, we are to construe the statute according to the plain meaning of its words.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'" (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000))); *Rubin v. United States*, 449 U.S. 424, 430 (1981).

If, however, the terms are ambiguous or unclear, we may consider legislative history and other tools of statutory construction.  *Greenery Rehab. Grp., Inc. v. Hammon*, 150 F.3d 226, 231 (2d Cir. 1998).  "The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute."  *Saks*, 316 F.3d at 345; *see also Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d Cir. 2012) ("[W]e consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme.") (quoting *Holloway v. United States*, 526 U.S. 1, 6 (1999)).

Here, we consider first the words of the statute and second the context in which the words appear.

- 12 -

1.    *The Words*

The TCPA provides that an "automatic telephone dialing system . . . has the capacity . . . (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  The words are no model of clarity, but we conclude that the better reading of the words is that an "automatic telephone dialing system" is one that generates *telephone* numbers.  *See Borden*, 53 F.4th at 1231; *Panzarella*, 37 F.4th at 881-82.

There are three references to the word "number" (in the singular or plural) in section 227(a)(1).  The first -- "telephone numbers to be called" -- unquestionably refers to telephone numbers.  So too does the third, which states that an ATDS can "dial such numbers. "   One "dials" a phone number, not a coding or index number.  And the "such" in "dial such numbers" is a straightforward reference to the "telephone numbers to be called. "  It would not make sense for the word "number" in this context to mean anything other than *telephone* numbers.

The remaining reference -- to a "number generator" -- is less clear, but it would be incongruous for "numbers" to refer to telephone numbers in the

first and third mention in the statute, but not the second. *See Pulsifer v. United States*, 144 S. Ct. 718 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings."). Accordingly, we conclude that the better reading of the word "number" in the phrase "number generator" is that it refers to generating the telephone numbers to be called and dialed.

### 2.    *The Context*

We consider also the context in which the words appear, in two respects:  first, the use of the word "number" in other parts of the TCPA; and, second, the broader context of the purpose of the TCPA.

### a.    *The Word "Number"*

When engaging in statutory interpretation, courts are to consider the statutory scheme as a whole, and "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme -- because the same terminology is used elsewhere in a context that makes its meaning clear." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute

must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))).

An examination of other references in the TCPA to the word "number" supports the interpretation that "number" in the definition of an ATDS refers to "telephone number" and not to a coding or indexing number *See Borden*, 53 F.4th at 1233 ("[T]he TCPA uses both 'telephone number' and 'number' interchangeably throughout the statute to mean telephone number, suggesting that in the definition section all uses of 'number' mean telephone number."). In the Do-Not-Call-Database section, for example, the TCPA bars solicitations directed "to the telephone number of any subscriber included in such database." 47 U.S.C. § 227(c)(3)(F). The TCPA then provides that regulations shall "prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose *numbers* are included in such database." *Id*. § 227(c)(3)(K) (emphasis added). Here, "numbers" clearly refers to "telephone numbers," not an index of numbers.

- 15 -

Similarly, in the discussion of "[c]aller identification service," the

TCPA provides:

> The term "caller identification service" means any service or device
> designed to provide the user of the service or device with the
> telephone number of, or other information regarding the origination
> of, a call made using a voice service or a text message sent using a
> text messaging service.  Such term includes automatic *number*
> identification services.

47 U.S.C. § 227(e)(8)(B) (emphasis added).  The reference to "number" here is also

to a telephone number, not an index number that dictates the order in which

telephone numbers are called.  Again, the use of the word "number" here the

interpretation that "number" in "random or sequential number generator" must

refer to "telephone number."

There are, of course, references to the word "number" elsewhere in

the TCPA where the context makes clear that the reference is to quantity and not

telephone number (or index or coding numbers).  For example, "number" is used

in expressions such as "number of complaints" (section 227(b)(2)(G)(i)(I),

(h)(2)(A)), "number of citations" (section 227(h)(2)(B)), "number of notices"

(section 227(h)(2)(C)) "number of final orders" (section 227(h)(2)(D)), and "number

of calls" (section 227(h)(2)(F), (G)).  While it is true that courts ordinarily presume

that "identical words used in different parts of the same act are intended to have

the same meaning," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 319 (2014), the

presumption of consistent usage "'readily yields' to context, and a statutory

term . . . 'may take on distinct characters from association with distinct statutory

objects calling for different implementation strategies.'" *Id.* at 320 (quoting *Env't*

*Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)). With the exception of these

obvious references to "number" as "quantity," "number" in the TCPA refers to

"telephone number," and not to coding or indexing numbers created by a random

number generator.

**b.** *The Purpose of the Statute*

A consideration of the broader context of the TCPA must also

include consideration of its purpose: to protect against automatic systems that,

by generating telephone numbers automatically, could tie up the telephone lines

of public emergency services and businesses with sequentially numbered

telephone lines, or otherwise result in tying up a called party's line. *See Duguid*,

592 U.S. at 399, 405 (citing H.R. Rep. No. 102-317, at 24 (1991)). These concerns

are not implicated by a system that uses a pre-existing list of telephone numbers

that are not automatically or randomly generated, but that are drawn from other

sources, including, as here, from consumers themselves who voluntarily

provided them.  *See Borden*, 53 F.4th at 1234-35 ("Using a random or sequential

number generator to select from a pool of customer-provided phone numbers

would not cause the harms contemplated by Congress.  Public emergency

services (such as police or fire departments) would presumably not be in these

customer-provided lists.  And if an autodialer called the phone numbers on its

customer list sequentially, it would likely not reach the sequential numbers often

assigned to a single business . . . .").  As the Supreme Court observed,

"[e]xpanding the definition of an autodialer to encompass any equipment that

merely stores and dials telephone numbers would take a chainsaw to these

nuanced problems when Congress meant to use a scalpel."  *Id*. at 405.

> **3.** ***Soliman's Additional Arguments***

Soliman makes three additional arguments that warrant discussion.

First, Soliman argues that if the TCPA were read to bar only the

automatic dialing of randomly generated telephone numbers -- leaving

companies free to call people on pre-exisiting lists -- then "Do Not Call" lists

would be rendered meaningless because one cannot consent to a call that is

randomly generated.  **[Blue at  34-37]**  We disagree that such an interpretation

would render Do Not Call lists meaningless.  When this legislation was drafted

- 18 -

in 1991, contemplating the establishment of "a single national database to

compile a list of telephone numbers of residential subscribers who object to

receiving telephone solicitations," Congress envisioned creating the capacity to

prevent autodialers from calling telephone numbers in the database.  47 U.S.C.

§ 227(c)(3).  The TCPA provides that the regulations governing the database will

"specify the methods by which such objections shall be collected and added to

the database" and "prohibit any person from making or transmitting a telephone

solicitation to the telephone number of any subscriber included in such

database."  *Id*. § 227(c)(3)(D), (F).  There is nothing in the language of the TCPA to

suggest that randomly generated telephone numbers -- to the extent they appear

on a Do Not Call list -- will not be protected.

Second, Soliman argues that FCC regulations support her position.

Specifically, she points to the discussion of "predictive dialers" in a 2003 FCC

order.  *See* In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of

1991, 18 FCC Rcd. 14014, 14091 (2003) ("2003 FCC Order").  In it, the FCC defined

predictive dialers as equipment that "has the capacity to store or produce

numbers and dial those numbers at random, in sequential order, or from a

database of numbers."  *Id*.  The FCC found that predictive dialers "fall[] within

the meaning and statutory definition of 'automatic telephone dialing equipment'

and the intent of Congress," even though they use numbers from a database.

2003 FCC Order at 14093.

The D.C. Circuit has addressed the issues raised by the FCC

regulations in its decision in *ACA International,* 885 F.3d at 699.  As the court

explained,

> A basic question raised by the statutory definition is whether a
> device must *itself* have the ability to generate random or sequential
> telephone numbers to be dialed.  Or is it enough if the device can
> call from a database of telephone numbers generated elsewhere?

*Id.* at 701.  The court recognized that the Commission's ruling was less than clear.

*Id.* ("The Commission's ruling appears to be of two minds on the issue.").  After

analyzing the Commission's reasoning supporting both positions, the court held

that "the Commission's ruling, in describing the functions a device must perform

to qualify as an autodialer, fails to satisfy the requirement of reasoned

decisionmaking."  *Id.* at 703.[3]  We agree that the FCC orders shed little light on

---

[3]      In *ACA International*, regulated entities sought review of a 2015 FCC Order
discussing "which sorts of automated dialing equipment are subject to the TCPA's
restrictions on unconsented calls."  *Id.* at 691.  The court held that because ordinary
smartphones could qualify as automatic telephone dialing systems under the 2015 FCC
Order, they could thus be subject to the restrictions and penalties of the TCPA.  *Id.* at
692.  The court concluded that this was too broad an interpretation of the TCPA and
therefore set aside part of the 2015 FCC Order.  *Id.*

- 20 -

the issue before us, and thus we give them little weight in our analysis. *See id.* at

703 ("The order's lack of clarity about which functions qualify a device as an

autodialer compounds the unreasonableness of the Commission's expansive

understanding of when a device has the 'capacity' to perform the necessary

functions.").

Third, Soliman argues that "number generator" is a term of art in the

industry, and must be given its technical meaning. Appellant's Reply Br. at 10-

11. A "number generator," she says, is a programming tool used to generate

random or sequential series of numbers, but not necessarily telephone numbers.

*Id.* Soliman's reading, however, is contrary to the ordinary meaning of the text.

*See Duguid*, 592 U.S. at 406-07. That ordinary meaning, considered in light of the

Supreme Court's holding in *Duguid*, which we turn to next, supports our

conclusion that the provision requires an autodialer to generate telephone

numbers to be covered by the TCPA.

**B.** ***Facebook v. Duguid***

The district court also held that the Supreme Court's decision in

*Duguid* does not support Soliman's position. *Soliman*, 2022 WL 2802347, at *2-3.

We agree. In *Duguid*, the Supreme Court considered "whether an autodialer

- 21 -

must have the capacity to generate random or sequential *phone* numbers."

*Duguid*, 592 U.S. at 401-02 (emphasis added). Its discussion supports the

conclusion that "random or sequential" numbers must refer to telephone

numbers. *See, e.g., id.* at 399 ("This case concerns 'automatic telephone dialing

systems' (hereinafter autodialers), which revolutionized telemarketing by

allowing companies to dial random or sequential blocks of *telephone* numbers

automatically." (emphasis added)).

The Court noted that Congress passed the TCPA to combat

annoying telemarketing calls to consumers and businesses, particularly systems

that could dial random or sequential blocks of telephone numbers automatically

and tie up telephone lines of public emergency services and all the lines of

businesses with sequentially numbered phone lines. *Id.* at 399-400. Clearly, the

"autodialer" the Supreme Court envisioned the TCPA covering is one that can

generate random or sequential telephone numbers, not a system that calls

random or sequential phone numbers from pre-existing lists of telephone

numbers generated in other ways.

The Supreme Court in *Duguid* also addressed whether the definition

of an automatic telephone dialing system "encompasses equipment that can

- 22 -

'store' and dial telephone numbers, even if the device does not 'us[e] a random or

sequential number generator.'" 592 U.S. at 399. The Court held that to qualify as

an automatic telephone dialing system, "a device must have the capacity either to

store a *telephone number* using a random or sequential [number] generator or to

produce a *telephone number* using a random or sequential number generator." *Id.*

(emphases added). Thus, "produce" means creating the telephone number in the

first place. *See Beal*, 29 F.4th at 394 (holding that a system that "does not generate

phone numbers to be called . . . does not 'produce telephone numbers to be

called' for purposes of § 227(a)(1) of the TCPA").

Accordingly, the district court here correctly held that, based on this

analysis, *Duguid* does not support the interpretation that an automatic telephone

dialing system includes a system that does not randomly or sequentially

generate telephone numbers but simply dials telephone numbers from pre-

existing lists. *Soliman*, 2022 WL 2802347, at *2-3.

Soliman understandably relies on footnote 7 of *Duguid*, which

appears at first glance to support her position. *See* 592 U.S. at 407 n.7. There, the

Supreme Court discussed a system that sounds similar to the one used by

Subway, namely, one that randomly selects telephone numbers from a pre-

- 23 -

existing list of numbers. This footnote was part of a discussion addressing

Duguid's argument that the Court should use a construction that "accords with

the 'sense' of the text." *Id.* at 406. Duguid insisted that the most sensible

construction of the TCPA applied the phrase "'using a random or sequential

number generator' to modify only 'produce,'" not "store," as definitions of

"generator" often include the word "produce," but not "store." *Id.* Duguid also

argued that the "technical meaning of a 'random number generator' invoked

ways of producing numbers, not means of storing them." *Id.*

The Court reasoned that this approach might be more compelling if

"applying the traditional tools of interpretation led to a linguistically impossible

or contextually implausible outcome." *Id.* at 406-07 (quotation marks omitted).

But it was linguistically possible to "store" numbers using a random number

"generator" and, in fact, patents had been issued for "devices that used a random

number generator to store numbers to be called later (as opposed to using a

number generator for immediate dialing)." *Id.* at 407. The Court then inserted

this footnote:

> Duguid argues that such a device would necessarily "produce"
> numbers using the same generator technology, meaning "store or" in
> § 227(a)(1)(A) is superfluous. "It is no superfluity," however, for
> Congress to include both functions in the autodialer definition so as

to clarify the domain of prohibited devices. *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 544, n.7, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994). For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time. See Brief for Professional Association for Customer Engagement et al. as *Amici Curiae* 19. In any event, even if the storing and producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute. *Atlantic Richfield Co. v. Christian*, 590 U. S. ——, ——, n.5, 140 S. Ct. 1335, 1350, n.5, 206 L. Ed. 2d 516 (2020).

*Id.* at 407 n.7. This footnote, however, merely notes that one could employ an autodialer to both "store" and "produce" telephone numbers, as two separate functions. It says nothing about whether the numbers on the preproduced list were randomly generated in the first place. And it does not mean that if the telephone numbers were *not* originally created by a random number generator, then the use of a random number generator to pick the pre-existing number is sufficient to meet the definition of an ATDS.[4] *See Borden,* 53 F.4th at 1235 ("Using a random or sequential number generator to select from a pool of customer-provided phone numbers would not cause the harms contemplated by Congress.

---

[4]    Even if Footnote 7 did suggest that such a device meets the definition of an ATDS, that result would be in serious tension with *Duguid*'s text. A stray example in a footnote must yield to the opinion's main text; doubly so when Footnote 7 itself conceded that Congress "may have employed a belt and suspenders approach in writing the statute." *Duguid*, 592 U.S. at 407 n.7 (internal quotation marks omitted).

. . . The [*Duguid*] Court's discussion of these risks would make no sense if the autodialer definition were not tailored to equipment capable of sequential or random generation of telephone numbers."); *accord Beal*, 29 F.4th at 395-96 ("Like other courts, we do not believe the Court's footnote indicates it believed systems that randomly select from non-random phone numbers are Autodialers.").[5] When read in the context of the entire opinion, footnote 7 does not support Soliman's position. Thus, this argument is unavailing.

### III.    *"Artificial or Prerecorded Voice"*

Soliman argues that Subway's text message violated the provision of the TCPA that makes it unlawful for "any person . . . to make any call . . . using . . . an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A). The district court correctly held that a text message is not a "voice."[6]

Once again, we first consider whether the meaning of the statute is clear from its text. In doing so, we consider the ordinary meaning of the words

---

[5]    *But see Scherre v. FPT Operating Co.*, 2023 WL 4660089, at *3 (collecting cases discussing footnote 7 and holding that an ATDS is not limited to a "telephone-number generator").

[6]    While Soliman has waived her argument that automated text messages use a prerecorded voice, she still argues that they use an "artificial voice." Appellant's Br. at 14 n.11.

at issue at the time the statute was drafted.  *See Perrin v. United States*, 444 U.S. 37,

42 (1979).

       Common sense tells us that "voice" -- especially in the context of a

statute regulating telephones -- will ordinarily refer to a sound produced by a

human being.  This tracks the dictionary definition of "voice" when the TCPA

was enacted in 1991 is "sound produced by vertebrates by means of lungs, larynx

or syrinx, and various buccal structures."  *Voice* (def. 1a) , Webster's Third New

International Dictionary (1993); *accord Voice* (def. 1a), American Heritage

Dictionary (1991) ("sound produced by the vocal organs of a vertebrate, esp. by

those of a human being"); *Voice* (1a), Webster's II New Riverside University

Dictionary (1994) (same).  While it is true that "voice" can be defined broadly to

include more than the human voice (like a metaphoric voice), that is not the

ordinary meaning of "voice."  *See Trim v. Reward Zone USA LLC*, 76 F.4th 1157,

1162 (9th Cir. 2023) ("The ordinary meaning of 'voice' when the TCPA was

enacted . . . was a '[s]ound formed in or emitted from the human larynx in

speaking.'"(quoting *Voice* (def. 1a), Oxford English Dictionary (2d ed. 1989))).

Just because a definition is "broad enough to encompass one sense of a word

does not establish that the word is *ordinarily* understood in that sense."

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012).

The language of the TCPA itself also makes clear Congress meant "voice" to mean something audible, not a text message.  As the district court noted, the TCPA defines "caller identification information" as information "regarding the telephone number of, or other information regarding the origination of, a call made using *a voice service or a text message* sent using a text messaging service."  47 U.S.C. § 227(e)(8)(A) (emphasis added).  Clearly, Congress considered a "voice service" and a "text messaging service" to be distinct categories.

The use of the word "voice" in other parts of the TCPA further supports the interpretation that a text message is not an artificial voice.  For example, section 227(d)(3) discusses "[t]echnical and procedural standards," including "[a]rtificial or prerecorded voice systems."  The section provides:

> [t]he Commission shall prescribe technical and procedural standards for systems that are used to transmit any *artificial* or prerecorded *voice* message via telephone.  Such standards shall require that . . . (B) any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system *that the called party has hung up*, to allow the called party's line to be used to make or receive other calls.

47 U.S.C. § 227(d)(3) (emphases added).   This is clearly referring to a telephone call, not a text message, as one cannot hang up on a text.  *Accord Trim*, 76 F.4th at 1162.

Accordingly, the district court did not err in holding that a text is not an "artificial voice."  *Accord Trim*, 76 F.4th at 1161 ("We hold that Congress clearly intended 'voice' in 47 U.S.C. § 227(b)(1)(A) to encompass only audible sounds, because the ordinary meaning of voice and the statutory context of the TCPA establish that voice refers to an audible sound.").

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

Nardacci, District Judge, concurring in part and dissenting in part:

I agree with the majority that a text message without an audio component does not constitute an "artificial or prerecorded voice" under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A). However, I respectfully dissent with respect to the majority's opinion that defendant-appellee's short message script ("SMS") technology does not constitute an automatic telephone dialing system ("ATDS" or "autodialer") under the principles of statutory interpretation and the Supreme Court's decision in *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021). There are five reasons for my different interpretation.

First, although I agree with the majority that the interpretation of a statute must begin with the text of the statute, I disagree with their interpretation of the plain language of this statute. The TCPA defines an ATDS as equipment that "has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The majority reads the word "telephone" into the phrase "random or sequential number generator" where it does not exist in the text to find that it means "random or sequential *telephone* number generator." The majority reasons that this is the correct interpretation because the phrases

"telephone numbers to be called" and "such numbers" are also included in the

definition.   The majority's reading of the statutory language overlooks the fact

that the clause "random or sequential number generator" is logically distinct

from "telephone numbers," as indicated by the use of a comma in the definition.

Additionally, "random or sequential number generator" has a well-recognized

technical meaning which is not limited to producing telephone numbers.   *See*

*Van Buren v. United States*, 593 U.S. 374, 388 (2021) (technical terms in a statute

should be interpreted based on their technical meaning).   As Judge VanDyke

explained in his concurring opinion in *Brickman v. United States*, 56 F.4th 688 (9th

Cir. 2022), "'random or sequential number generator' has a known meaning as a

computational tool" that "can produce anything from single digit numbers to zip

codes to telephone numbers."   *Id.* at 691 (VanDyke, J., concurring); *see also id.* at

691-92 ("[A] random (or sequential) number generator is a term of art referring to

a particular type of computation tool that can be used to generate all types of

different numbers, from telephone numbers to zip codes to a sequence of

consecutively ordered numbers."); Brief of the Electronic Privacy Information

Center ("EPIC") et al. as *Amici Curiae* in Support of Plaintiff-Appellant and

Reversal at 5–8.

2

Second, the majority's reading of "random or sequential number generator" is implausible because it renders the word "store" as used in the definition, "to store or produce telephone numbers to be called," superfluous. *See Brickman*, 56 F.4th at 692 (VanDyke, J., concurring) (noting that "redefining an autodialer as equipment that can 'store . . . telephone numbers to be called, [which are produced] using a random or sequential [telephone] number generator' . . . renders 'store' superfluous [in 47 U.S.C. § 227(a)(1)(A)] since the definition already covers telephone numbers that are 'produced . . . using a random or sequential number generator'").

Third, the majority's reading of an ATDS as "equipment . . . using a random or sequential *telephone* number generator," would render the prior express consent exception in the TCPA, 47 U.S.C. § 227(b)(1)(A), superfluous. "Prior express consent" requires a caller to obtain permission before using an autodialer to call a telephone number. *See* In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 7 FCC Rcd. 8752, 8769 (1992). The "prior express consent" exception envisions that a "random or sequential number generator" is used to select numbers to be dialed from a list of telephone numbers of consenting parties. If Congress intended to prohibit as an ATDS

3

only equipment that generates telephone numbers, then equipment that dials telephone numbers from a stored or pre-existing list of telephone numbers would not be an ATDS and there would be no need for the prior express consent exception. *See* Brief of EPIC as *Amici Curiae* at 11–13.

Fourth, the holding from *Duguid* supports the conclusion that a "random or sequential number generator" can include use with a stored or pre-existing list of telephone numbers. The *Duguid* Court held that to qualify as an ATDS, a device must have the capacity to either "store" *or* "produce" telephone numbers "using a random or sequential number generator." *See* 592 U.S. at 402. The Supreme Court confirmed that "using a random or sequential number generator" modifies *both* words. *Id.* at 402-03. However, the *Duguid* Court did not consider what it means for a "random or sequential number generator" to store or produce telephone numbers. *Id.* at 402-04; *see also Eggleston v. Reward Zone USA LLC*, No. 2:20-CV-01027-SVW-KS, 2022 WL 886094, at *3 (C.D. Cal. Jan. 28, 2022) ("*Duguid* establishes that an [ATDS] must 'use a random or sequential number generator to either store or produce phone numbers,' but it did not specify what it means to 'store or produce' the phone numbers.").

Footnote 7 of *Duguid* supports reading a "random or sequential number

4

generator" to include equipment that can dial telephone numbers from a stored or pre-existing list of numbers.   In footnote 7, the Supreme Court referenced the possibility that "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list.   It would then store those numbers to be dialed at a later time."   592 U.S. at 407 n.7. I agree with those district courts that have read this footnote to support the conclusion that an ATDS includes equipment that stores and dials telephone numbers from a pre-existing list, and that an ATDS is not limited to equipment that generates *telephone* numbers.   *See, e.g., Scherrer v. FPT Operating Co.*, No. 19-cv-03703 (SKC), 2023 WL 4660089, at *3 (D. Colo. July 20, 2023) (collecting cases discussing footnote 7 of *Duguid* and finding that "an ATDS is not limited to a telephone-number generator"); *see also United States v. Bell,* 524 F.2d 202, 206 (2d Cir. 1975) (Supreme Court dicta "must be given considerable weight").

Finally, interpreting "random or sequential number generator" according to the plain language of the statute and its technical meaning is consistent with the purposes of the TCPA.   *Duguid* explained that Congress was concerned with the harmful effects of autodialers, including harm to individual consumers.   *See* 592 U.S. at 400 ("Autodialers could reach cell phones, pagers, and unlisted

5

numbers, inconveniencing consumers and imposing unwanted fees."). Although it had a particular concern with preventing the telephone lines of public emergency services and businesses from being tied up, more generally Congress sought to prohibit the use of autodialers because unwanted telephone calls can be both inconvenient and costly to consumers. Moreover, prohibiting the use of the SMS technology at issue in this case does not create the same concerns as prohibiting common dialing devices, such as cell phones or the autotrigger dialing system used by Facebook in *Duguid*, which "merely store[d] and dial[ed] telephone numbers." 592 U.S. at 405; *see Scherrer*, 2023 WL 4660089, at *5 (noting that "the Supreme Court's concern about whether modern cell phones would be included in the definition of an ATDS is understandable" in the context of the *Duguid* plaintiff's argument that equipment that can store and dial telephone numbers even if it does not use a "random or sequential number generator" can qualify as an ATDS).

For these reasons, I respectfully dissent from Part II of the Majority Opinion.